**REVERSE, RENDER and REMAND and Opinion Filed February 14, 2023**



In The
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-21-00649-CV**
_____

**CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH AND CREDIT SUISSE (USA) LLC, Appellants**
**V.**
**CLAYMORE HOLDINGS, LLC, Appellee**

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-13-07858**

## MEMORANDUM OPINION

Before Justices Nowell and Smith[1]
Opinion by Justice Nowell

This case arises from the inflated appraisal of a residential real estate project near Las Vegas shortly before the 2007 housing financial crisis. We affirmed the original underlying judgment awarding appellee Claymore Holdings, LLC $211,863,998.56 in equitable rescissory damages, $74,644,154.22 in prejudgment interest, court costs, and post-judgment interest. *See Credit Suisse AG v. Claymore Holdings, LLC*, 584 S.W.3d 18, 24 (Tex. App.—Dallas 2018), *rev'd*, 610 S.W.3d

---

[1] The Honorable Leslie L. Osborne participated in the submission of this case; however, she did not participate in the issuance of this memorandum opinion due to her resignation on October 24, 2022.

808 (Tex. 2020). The Texas Supreme Court reversed and remanded to the trial court for reconsideration of damages in light of its opinion. *Id.* On remand, the trial court awarded $40 million in fraudulent inducement damages determined by the jury, plus pre- and post-verdict interest, less allocable settlement credits. The trial court also awarded an additional $23,235,910.61 in damages. The final judgment totaled $121,132,984.48.

Credit Suisse now raises three issues on appeal with multiple sub-issues relating to the trial court's damages award on remand. Broadly stated, Credit Suisse challenges (1) the damage award for Claymore's secondary market purchases because Claymore failed to seek a jury finding that Credit Suisse was liable for fraudulently inducing any secondary market purchases; (2) the trial court erred in allocating certain settlement credits; and (3) the trial court erred in calculating prejudgment interest under applicable New York law on the net verdict after deducting applicable settlement credits.

We reverse the $23,235,910.61 damages award for Claymore's secondary market purchases and render a take-nothing judgment on this claim. We conclude the trial court erred by failing to allocate certain settlement credits to the jury's $40 million award for fraudulent inducement. Because the trial court did not have an opportunity to consider prejudgment interest under the new damages award calculation, we remand to the trial court for further proceedings.

## Background[2]

In 2007, Highland, a group specializing in distressed debt, invested $250 million in a refinancing of real property in the Lake Las Vegas residential community. Credit Suisse arranged the refinancing using an appraisal Credit Suisse knew to be unreasonable and inflated resulting in Highland losing millions of dollars in its investment.

On July 12, 2013, Highland formed Claymore for the express purpose of "the pursuit of all claims against Credit Suisse . . . related to the loans made and losses suffered . . . in connection with the Lake Las Vegas Residential Community and Golf Courses." It is undisputed Claymore[3] is the valid and effective assignee of several funds that were lenders under a credit agreement either as initial investors in the refinancing or as a result of purchases on the secondary market of debt.

Claymore sued Credit Suisse for legal and equitable damages for fraudulent inducement, breach of contract, aiding and abetting fraud, civil conspiracy, breach of the implied duty of good faith and fair dealing, and unjust enrichment. Highland eventually recovered settlements related to its refinancing losses from the LLV

---

[2] The facts of this case are well-known to the parties and extensively documented in the 55-volume reporter's record, the trial court's comprehensive findings, the original appeal from this Court, and the Supreme Court of Texas's opinion. We summarize only those facts necessary to provide a brief context of the underlying lawsuit and to resolve the parties' issues in this second appeal. TEX. R. APP. P. 47.1.

[3] In this Court's first opinion and the Texas Supreme court opinion, the courts both referred to "Claymore" throughout the opinions even though Highland had not made the assignment at the time of the 2007 refinancing transaction. For clarity in addressing the issues in this appeal, we refer to the parties separately.

Developers ($23,275,710), C&W ($12 million), the company hired to appraise the development, and CBRE ($21 million), the company hired to prepare the appraisal. Highland received all three settlements prior to Claymore going to trial against Credit Suisse.

The trial court bifurcated Claymore's claims: (1) a jury trial in December 2014 on Claymore's fraudulent inducement claim based on its initial investment in refinancing; and (2) a bench trial in May 2015 on liability and damages for Claymore's remaining claims, including a request for rescissory damages on the fraudulent inducement claim.

The jury found Credit Suisse liable for fraudulent inducement and awarded $40 million in damages. After the bench trial, the trial court found Credit Suisse liable on Claymore's remaining claims and after accounting for offsets, it awarded Claymore in equitable relief the price it paid for its initial investment ($215,773,287.95) and the price paid for its secondary market purchases ($23,235,910.61). This Court affirmed the judgment. *See Credit Suisse AG*, 584 S.W.3d at 18.

The Texas Supreme Court concluded an adequate remedy at law existed precluding equitable rescissory damages and remanded to the trial court for "entry of judgment consistent with the opinion" regarding Claymore's fraudulent inducement claim, the only claim tried to the jury in the bifurcated trial. 610 S.W.3d at 830. It reversed and rendered judgment on all remaining claims tried to the bench.

–4–

*Id.* In footnote 18 of the opinion, the supreme court explained "because there may be certain matters still in dispute" such as "questions about the availability of and amount of prejudgment interest on [the fraud] claim, the treatment of settlement credits in relation to the jury's allocation of fault, and damages for secondary market purchases," the supreme court refused to render judgment on the jury's fraudulent inducement finding and award the $40 million in damages determined by the jury.

On remand, the trial court awarded $40 million in fraud damages, plus pre- and post-verdict interest, less allocable settlement credits. The trial court also awarded an additional $23,235,910.61 in damages, which equaled the price Claymore paid for the secondary market purchases, plus pre- and post-verdict interest, less allocable settlement credits. The final judgment totaled $121,132,984.48.

The trial court's interpretation of footnote 18's directive from the supreme court in entering judgment, among other things, brings the parties before this Court once again.

### Secondary Market Purchases

The supreme court remanded for rendition of judgment on the jury's fraudulent inducement finding and rendered a take nothing judgment on all of Claymore's remaining claims tried to the bench. On remand, the trial court awarded an additional $23,235,910.61 for secondary market purchases in addition to the $40 million in damages for fraudulent inducement.

In its first issue, Credit Suisse argues the trial court erred by awarding damages for the secondary market purchases because the jury was not asked and did not make any liability finding regarding Credit Suisse's fraudulent inducement of any secondary market purchases. Credit Suisse also contends Claymore failed to challenge the trial court's decision to exclude the secondary market purchases from the jury charge in its first appeal thereby waiving the issue in this second appeal. Alternatively, despite these procedural shortcomings, Credit Suisse asserts the record lacks clear and convincing evidence, as required under New York law,[4] to support the essential elements of fraudulent inducement.

Claymore responds the trial court properly awarded damages for fraudulent inducement on the secondary market purchases because Credit Suisse never challenged the amended findings of fact and conclusions of law from the original bifurcated trial, which included findings and conclusions on the secondary market purchases; therefore, Credit Suisse waived its argument. Alternatively, to the extent Credit Suisse did not waive its argument, Claymore contends the evidence is sufficient to support the award.

It is well established no recovery is allowed unless liability is established. *See Mitchell v. Bank of Am., N.A.*, 156 S.W.3d 622, 627 (Tex. App.—Dallas 2004, pet. denied); *see also Miller v. Baer*, 189 N.Y.S. 149, 150 (N.Y. App. Term 1921) (noting

---

[4] It is undisputed New York law applies to substantive claims. Procedural issues, however, are governed by Texas law. *See McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 824 (Tex. App.—Dallas 2010, no pet.). Procedure includes standards of review. *Id.*; *see also Credit Suisse*, 584 S.W.3d at 26.

damage from the act complained of must be proven).  In the absence of liability, the question of damages becomes immaterial.  *Id*.  Here, the jury was asked only whether Credit Suisse "fraudulently induce[d] Plaintiff to participate in the 2007 Lake Las Vegas *Refinancing* by making affirmative representations[.]"  (Emphasis added).  The jury was not asked to determine liability as to the secondary market purchases; therefore, the record contains no liability or causation finding to support damages for the fraudulent inducement of secondary market purchases.  Further, Claymore's proposed jury charge did not include a question on fraudulent inducement of secondary market purchases, and Claymore did not object to the absence of the question.  The rules of civil procedure require an objection to the charge; otherwise, "[a]ll objections not so presented shall be considered as waived."  TEX. R. CIV. P. 272; *see also* TEX. R. CIV. P. 274 ("A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection.").

To overcome these glaring procedural defaults, Claymore relies on the trial court's amended findings of fact/conclusions of law from the bench trial and footnote 18 of the supreme court's opinion.  We conclude neither supports the trial court's award of damages for secondary market purchases.

Under New York law, a cause of action based on fraud must assert "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission,

and injury." *Connaughton v. Chipotle Mexican Grill, Inc.*, 29 N.Y.3d 137, 142, 75 N.E.3d 1159, 1163 (2017). Claymore had the burden to prove these elements by clear and convincing evidence. *See Hidden Pond Schodack, LLC v. Hidden Pond Homes, Inc.*, 189 A.D.3d 1792, 1795 (N.Y. App. Div. 2020).

Claymore repeatedly references the trial court's "liability finding" on the secondary market purchases. Its repeated reference to any such finding is unsupported. The trial court made no such findings or conclusions on any fraudulent inducement element.[5] The trial court did, however, enter specific findings and conclusions as to each cause of action tried to the bench. Each cause of action is discussed separately in a bolded and underlined heading. There is not a separate section for fraudulent inducement of secondary market purchases.

To the extent Claymore relies on conclusion of law 81 (under the heading "Damages for Fraudulent Inducement"), it reads words into the sentence that do not exist. Conclusion of law 81, in relevant part, states "Plaintiff is entitled to recover $23,235,910.61 as an assignee in connection with the Plaintiff Funds' secondary market purchases." The court's conclusion does not establish "all of the prerequisites for Claymore's secondary market claim," and we refuse Claymore's

---

[5] The introduction paragraph to the findings of fact/conclusions of law states, "After a jury was impaneled and sworn, it heard the evidence and arguments of counsel on Plaintiff's claim for fraudulent inducement."

invitation to conclude the trial court made an implicit finding and conclusion. Instead, the court merely found rescissory damages were appropriate.[6]

Moreover, in conclusions of law 76 and 77, the trial court stated that under New York law, the applicability of rescissory damages was a question for the court and not the jury; therefore, the jury did not and could not consider them. The court reiterated the damages for fraudulent inducement were found by the jury as it related to "investing in the Refinancing." Accordingly, the trial court's findings and conclusions do not support Claymore's position regarding secondary market purchases.

The supreme court vacated the trial court's equitable award, which included the $23,235,910.61 Claymore paid for secondary market purchases. *Credit Suisse AG*, 610 S.W.3d at 830. By awarding the same amount of damages on remand, the trial court allowed recovery of damages despite the absence of liability. *See Mitchell*, 156 S.W.3d at 627.

In reaching this conclusion, we reject Claymore's interpretation of footnote 18 in the supreme court's opinion as a directive to the trial court to award damages on the secondary market purchases. When an appellate court remands a case with specific instructions, the trial court is limited to complying with the instructions and

---

[6] Finding of fact 81 states in its entirety, "As a result, Plaintiff is entitled to rescissory damages based on the Plaintiff Funds' primary purchases in the amount of $215,773,287.95 (*see* PX2385), for which Defendants are jointly and severally liable. Moreover, Plaintiff is entitled to recover $23,235,l910.61 as an assignee in connection with Plaintiff Funds' secondary market purchases (*see* PX2386)."

cannot relitigate issues settled at the former trial. *See Denton Cty. v. Tarrant Cty.*, 139 S.W.3d 22, 23 (Tex. App.—Fort Worth 2004, pet. denied); *see also Lancaster v. St. Yves*, No. 01-17-00250-CV, 2018 WL 6175311, at *6 (Tex. App.—Houston [1st Dist.] Nov. 27, 2018, pet. denied). To the extent the judgment of the trial court exceeds that limited scope of authority, it does so without jurisdictional authority. *Bramlett v. Phillips*, 359 S.W.3d 304, 311 (Tex. App.—Amarillo 2012), *aff'd*, 407 S.W.3d 229 (Tex. 2013).

Here, nothing within footnote 18 required the trial court to resurrect the secondary market claims and award damages. Instead, the supreme court indicated there "*may* be questions about the availability of . . . damages for secondary market purchases." *Credit Suisse AG*, 610 S.W.3d 830 n.18 (emphasis added). Thus, the trial court did not exceed its limited scope of authority per se, but instead incorrectly resolved whether there were still matters in dispute regarding damages for secondary market purchases.

Finally, we reject Claymore's assertion that Credit Suisse waived its argument by "strategically" choosing not to appeal the liability finding in the first appeal. The jury made no liability finding on the secondary market purchases; therefore, there was nothing for Credit Suisse to appeal at that stage in the proceedings.

We sustain Credit Suisse's first issue. Accordingly, we reverse the $23,235,910.61 damages awarded for the secondary market purchases and render judgment against Claymore.

## Settlement Credits

In its second issue, Credit Suisse argues the trial court erred by failing to award settlement credits for the full amounts Highland received from the $23,275,710 LLV settlement, the $21 million CBRE settlement, and the $6,145,200 C&W settlement. Claymore responds Credit Suisse's arguments distort New York law regarding settlements credits, and the trial court correctly apportioned the applicable settlement credits.

After the first trial, the court concluded that pursuant to New York General Obligations Law § 15-108, Credit Suisse was entitled to settlement credits as follows: $21 million from CBRE and $6,145,200 from C&W. It concluded Credit Suisse was not entitled to any settlement credits from LLV because "the Plaintiff Funds were not releasors and the underlying lawsuit did not involve the same injuries for which the Plaintiff Funds seek to recover here."

On remand, the trial court applied $16,932,422.65 for the CBRE settlement and $4,954,910.65 for the C&W settlement to the jury's $40 million verdict. The trial court again refused to apply the LLV settlement credit.

Neither party suggests a standard of review for determining whether the trial court correctly applied some, but not all, of the settlement credits. Depending on circumstances, appellate courts have applied either an abuse of discretion or de novo standard of review. *See Utts v. Short*, No. 03-03-00512-CV, 2004 WL 635342, at *3 (Tex. App.—Austin Apr. 1, 2004, pet. denied) (mem. op.) (applying abuse of

discretion review when analysis did not involve statutory interpretation); *Oyster Creek Fin. Corp. v. Richwood Invs. II, Inc.*, 176 S.W.3d 307, 326 (Tex. App.—Houston [1st Dist.] 2004, pet denied) (applying abuse of discretion when reviewing amount of settlement credit); *Wein v. Sherman*, No. 03-10-00499-CV, 2013 WL 4516013, at *11 (Tex. App.—Austin Aug. 23, 2013, no pet.) (applying de novo review).

Our analysis of the LLV settlement turns on questions of statutory construction, construction of the settlement agreement, and application of legal principles that do not involve questions of disputed facts. We, therefore, review such legal questions de novo. *See Galle, Inc. v. Pool*, 262 S.W.3d 564, 571 n.3 (Tex. App.—Austin 2008, pet. denied); *see also Wein*, 2013 WL 4516013, at *11.

New York General Obligations Law section 15-108 provides the following, in relevant part, regarding releases:

> When a release or a covenant not to sue or not to enforce a judgment is given to one or two or more persons liable or claimed to be in tort *for the same injury* . . . it reduces the claim of *the releasor* against the other tortfeasors to the extent of any amount stipulated by the release of the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages . . . whichever is the greatest.

N.Y. GOL § 15-108(a) (McKinney 2007) (emphasis added). Nothing in section 15-108 requires the two defendants be liable upon the same theory. *Kock v. Greenberg*, 14 F. Supp. 3d 247, 271 (S.D.N.Y. 2014), *aff'd*, 626 Fed. Appx. 335 (2d Cir. 2015). All that is required is they be subject to liability for damages for the same injury. *Id*.

The purpose of General Obligations Law 15-108 is to encourage settlements. *Westwood Chem. Co., Inc. v. Kulick*, 570 F. Supp. 1032, 1039 (S.D.N.Y. 1983) (citing 12th Ann. Rep. [1974] McKinney's Sess. Laws 1791, 1817). "A prelitigation settlement is one of the most inexpensive means of resolving disputes and therefore should be encouraged as a matter of public policy." *Id*. Further, New York courts have recognized that General Obligations Law 15-108 is consistent with the equitable principle that a claimant may not obtain a double recovery for the same injuries and damages. *See Carter v. State*, 528 N.Y.S.2d 292, 427 (N.Y. Ct. Cl. 1988).

Credit Suisse argues the LLV, CBRE, and C&W settlements concern a release of liability for the same injury found by the jury—damages resulting from Highland's reliance on the faulty appraisal when investing in the Refinancing. Thus, it contends the $40 million judgment must be reduced by the $50,420,910 Highland received from all three settlements thereby resulting in a net zero verdict. We address each settlement in turn.

Highland received $23,275,710 from LLV. To be entitled to a settlement offset, Credit Suisse needed to establish that Claymore, as Highland's assignee, was a releasor and the LLV settlement released a party "liable or claimed to be in tort for the same injury" forming the basis of the jury's verdict. N.Y. GOL § 15-108(a).

Per the LLV "Settlement and Release," the "Creditor Trust" was created pursuant to a bankruptcy plan "on behalf of and for the benefit of various creditors,

–13–

including: (i) Class 1 creditors (the Pre-Petition Lender Beneficiaries)," among others, collectively referred to as "Beneficiaries." Highland was defined as a Class 1 creditor. Thus, by the plain language of the settlement agreement, Highland was included as a "Beneficiary" of the "Creditor Trust."

The "Creditor Trust Assets" included, in relevant part, "the Avoidance Actions and Insider Actions and the proceeds thereof, which shall be deemed assigned to the Creditor Trust on the Effective Date." The settlement defined "Avoidance Actions" in relevant part as "all claims and causes of action held by any Debtor." It defined "Insider Actions" in relevant part as "the claims and causes of action held by any Debtor."

Claymore contends these definitions expressly limited the scope of the Trustee's authority to prosecute and settle claims to the Insider and Avoidance actions held by the Debtors. Because the "Creditor Trust Assets" included actions held by only the Debtors, not Highland, the Trustee could not have released Highland's claims through the LLV Settlement. We disagree.

Claymore ignores key definitions and provisions in the LLV Creditor Trust Agreement and the LLV Settlement indicating the Debtors no longer owned the Avoidance and Insider Actions. Article VII, Establishment of the Creditor Trust, detailed the "Transfer of Assets to Creditor Trust." It provided that the Debtors and Creditor Trustee established the Creditor Trust "on behalf of the Beneficiaries, to be treated as the *grantors and deemed owners of the Creditor Trust Assets*," and the

–14–

Debtors "transferred, assigned, and delivered to the Creditor Trust, on behalf of the Beneficiaries, all of their right, title, and interest in the Creditor Trust Assets, including Avoidance Actions and Insider Actions." (Emphasis added). Further, the Creditor Trustee held the Creditor Trust Assets in the Creditor Trust for the benefit of the Beneficiaries, subject to the terms of the Plan and the Agreement. Highland was a beneficiary under the Credit Trust.

The LLV Settlement provided that the "Trustee of the Creditor Trust pursuant to his authority under the Plan" had the "authorization to bind the Debtors and Beneficiaries to the terms of this settlement." Construing the provisions and definitions together, we conclude Highland, as a beneficiary under the Creditor Trust, which included Creditor Trust Assets Highland owned by assignment from the Debtors, and such assets included causes of actions the Trustee had power to pursue (and did pursue and settle) on Highland's behalf, Highland was a "releasor" for purposes of N.Y. GOL § 15-108(a). As the valid and effective assignee of Highland, Claymore likewise was a "releasor" for purposes of the statute.

This does not end the analysis. We must now determine whether the "same injury" requirement of section 15-108(a) was met. N.Y. GOL § 15-108(a).

Credit Suisse argues the LLV Settlement released claims for the same injury determined by the jury. Claymore responds the LLV Settlement resolved claims related to injuries suffered by the Debtors, not Highland, and the Trustee only

–15–

released those claims the Debtors may have held arising from the 2004 dividend, the 2007 refinancing, or any other event. Again, we disagree.

The LLV Settlement provided that "the Parties have compromised and settled all their differences, and they now wish to resolve all disputes between them relating to the Debtors, including but not limited to all disputes relating to the November 2004 Loan, the November 2004 Distribution, the Subsequent Projections, and the Debtors' bankruptcy." "Subsequent Projections" included "subsequent valuations of the Debtors' assets and projections of revenue following the November 2004 Distribution, including but not limited to *valuations and projections made in connection with the 2007 refinancing* of the Debtors' debt." (Emphasis added). As described, the LLV Settlement released and resolved the LLV Developers' claims related to "projections made in connection with the 2007 refinancing." This is the same injury Claymore pursued in the trial court, and the jury found and awarded damages.

The jury charge defined "Claymore," in relevant part, as "an entity that was assigned the claims brought in this lawsuit" by entities (including Highland) that "participated as lenders or acquired the interests of lenders in the 2007 Lake Las Vegas refinancing transaction." The jury charge instructed the jury to determine damages for "[t]he difference, if any, between what [Claymore] paid and the value of what [Claymore] received in the 2007 Lake Las Vegas Refinancing." The jury answered $40 million. In the following question, the jury was asked to "state the

percentage of fault of CBRE, Cushman & Wakefield, Lake Las Vegas Developers/Management" and Credit Suisse entities.[7]  The jury assigned ten percent of fault to Lake Las Vegas Developers/Management.  Thus, the $40 million awarded to Claymore included damages for the same injury encompassed in the LLV Settlement (the 2007 Refinancing).

Our conclusion is further supported by the trial testimony of Scott Ellington, Highland's Chief Legal Officer.  During the trial on the merits, he testified Highland's portion of the LLV Settlement was approximately $23 million.  He admitted Highland applied the $23 million as an offset to the damages it was seeking at trial.  He confirmed the LLV Settlement included claims related to the 2007 Refinancing.

We conclude the LLV Settlement satisfies the requirements of section 15-108(a); therefore, the trial court erred by failing to reduce the $40 million jury verdict by $23,275,710.00.  In reaching this conclusion, we reject Claymore's argument Credit Suisse waived its argument by failing to challenge the trial court's findings and conclusions in the first appeal.  The trial court accounted for the LLV Settlement as part of its rescissory damages award in the first judgment; therefore, Credit Suisse had no reason to appeal the court's decision at that stage.  Because the supreme court

---

[7] The charge further instructed that CBRE, C&W, and LLV Developers/Management were not defendants in the case; nevertheless, the jury had to consider whether any were at fault (as well as Credit Suisse) for causing Claymore's losses.

reversed the rescissory damages award and the trial court failed on remand to deduct the LLV Settlement from the jury's $40 million damages award, Credit Suisse raised its argument at its first opportunity on remand.

We likewise reject Claymore's invitation to rely on the Trustee's bankruptcy complaint to define the scope of the injury suffered by the Debtors. In the complaint, the Trustee asserted, "The key event in this lawsuit is a $470 million distribution that the owners of the LLV paid to themselves on November 1, 2004." Thus, Claymore argues it did not (and could not) seek damages from the 2004 Distribution paid to the LLV developers; therefore, the LLV Settlement was not for the same injury.

Claymore ignores the language of the LLV Settlement, which includes a much broader release than the 2004 Distribution and encompasses the 2007 Refinancing. The application of section 15-108 is determined by the scope of the release. Claymore has failed to provide authority indicating otherwise. Instead, Claymore encourages the Court to ignore the "brief reference to the 2007 Refinancing as irrelevant" in the LLV Settlement. We refuse its invitation. The LLV Settlement specifically stated the "claims and objections of the Lawsuit related to, among other things, . . ., including but not limited to . . . the 2007 refinancing (the "Subsequent Projections"). The parties settled and compromised all their differences, which included those related to the "Subsequent Projections." These are not irrelevant, brief references but instead express releases of claims. Accordingly, the trial court erred by refusing to apply the $23,275,710.00 LLV Settlement to the jury's damages

–18–

award. Applying the LLV Settlement, the damages award is reduced to $16,724,290.00.

We next consider the trial court's allocation of the CBRE and C&W Settlements to the jury verdict. Neither party disputes Credit Suisse is entitled to setoffs for the CBRE and C&W Settlements. Instead, they disagree on the amount Credit Suisse is entitled based on the trial court's calculations. We review the allocation of these settlement credits for an abuse of discretion. *See Utts v. Short*, No. 03-03-00512-CV, 2004 WL 635342, at *3 (Tex. App.—Austin Apr. 1, 2004, pet. denied) (mem. op.) (applying abuse of discretion review); *Oyster Creek Fin. Corp.*, 176 S.W.3d at 326.

When the settling party seeks to limit its effect in a subsequent action, the burden is on that party to establish "why and to what effect it should be accorded less than its apparent full effect." *Id*. at 428. If the releasor fails to do so, all the monies paid for the release will be applied to reduce the terms of the release. *Westwood Chem. Co., Inc.*, 570 F. Supp. at 1039.

Credit Suisse asserts it is entitled to the full amounts of the CBRE Settlement ($21 million) and C&W Settlement ($6,145,200) because Claymore failed to present evidence that any portion of the settlements were for an injury other than what the jury found ("losses Highland suffered from its direct purchase of LLV debt in the

–19–

Refinancing").[8]  Both parties submitted post-submission letters explaining their positions as to how the Court should apportion applicable settlement credits if the Court reversed the trial court's damages award for the Secondary Market Purchases (which we have) and how to calculate interest.

Credit Suisse argues that after subtracting the full amounts of the three settlements from the jury's damages award, the result is - $10,420,910.00.[9]  Thus, Claymore's judgment equals zero.  Claymore responds the trial court had all the evidence necessary to make the allocations, which included "the gross value of the debt underlying the two claims, the settlement agreements themselves, and, of course, the settlement amounts," and properly allocated $16,932,422.65 of the CBRE Settlement and $4,954,910.65 of the C&W Settlement to the $40 million award.

We need not decide whether the trial court erred in calculating and allocating the CBRE and C&W Settlements.  Assuming without deciding the trial court correctly allocated the CBRE and C&W Settlements, the two settlements total $21,887,333.30 which is *greater* than the amount of damages left after subtracting the LLV Settlement.[10]  Therefore, regardless of whether we entertain Credit Suisse's

---

[8] It is undisputed Highland settled with C&W for $12 million; however, only $6,145,200 of the settlement was allocable to the Refinancing.

[9] $40,000,000 - $23,275,710 - 21,000,000 - 6,145,200 = -$10,420,910.00.

[10] $40 million (Jury damages award) - $23,275,710.00 (LLV Settlement) = $16,724,290.  $16,724,290 (damages award after applying LLV Settlement) - $21,887,333.30 (CBRE + C&W Settlements) = -$5,163,043.30.

argument or accept Claymore's argument, we land in the same place—a negative damages number resulting in a $0 judgment for Claymore. *See, e.g.*, *Williams by Williams v. Niske by Niske*, 615 N.E.2d 1003, 1005 (N.Y. 1993) ("If the settlements exceed the verdict, the nonsettling defendants have no liability at all."). Accordingly, we sustain Credit Suisse's second issue.

## Prejudgment Interest

In its final issue, Credit Suisse argues the trial court erred in calculating prejudgment interest when it deviated from well-established New York law. Claymore responds the court acted within its discretion and properly calculated prejudgment interest.

The standard of review for a trial court's award of prejudgment interest is abuse of discretion. *See Rosenthal v. Rosenthal*, No. 01-99-00058-CV, 2001 WL 1383132, at *5 (Tex. App.—Houston [1st Dist.] Nov. 8, 2001, pet. denied). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Id*.

Both parties agree interest is not a penalty, but rather the cost of using another person's money for a specified period of time; it is not meant to punish defendants for delaying the final resolution of the litigation. *See Love v. State*, 78 N.Y.2d 540, 544 (N.Y. 1991). It is not to provide a windfall to either party, but instead a form of compensation intended to make the injured party whole. *See Mitsui & Co., Ltd. v. American Export Lines, Inc.*, 636 F.2d 807, 824 (2d Cir. 1981). The parties disagree,

however, on how to calculate prejudgment interest when considering the settlement credits.

After the first trial, the court used the aggregate method to calculate damages. On remand, the trial court deviated from the aggregate method and instead adopted a different approach suggested by Claymore called the *Bauman* method. We are mindful of the broad discretion a trial court has in calculating prejudgment interest; however, the trial court used both methods at different stages of this complex litigation. Because a settlement credit applies that the trial court did not account for when calculating prejudgment interest, the trial court should be given the opportunity to consider the best method to promote the objectives of prejudgment interest under New York law given our resolution of Credit Suisse's issues on appeal. Accordingly, we decline to provide an advisory opinion on prejudgment interest and remand for further proceedings.

## Conclusion

We reverse the $23,235,910.61 damages award for Claymore's secondary market purchases and render a take-nothing judgment on this claim. We conclude the trial court erred by failing to allocate the LLV settlement credit to the jury's $40 million award for fraudulent inducement. Because the trial court did not have an opportunity to consider prejudgment interest under the new damages award calculation,

we remand to the trial court for further proceedings.


/Erin A. Nowell/
ERIN A. NOWELL
JUSTICE


210649F.P04



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH AND CREDIT SUISSE (USA) LLC, Appellants

No. 05-21-00649-CV     V.

CLAYMORE HOLDINGS, LLC, Appellee

On Appeal from the 134th Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-13-07858. Opinion delivered by Justice Nowell. Justices Smith participating.

In accordance with this Court's opinion of this date, the trial court's award of $23,235,910.61 for appellee Claymore Holdings, LLC's secondary market purchases is **REVERSED** and judgment is **RENDERED** that appellee Claymore Holdings, LLC take nothing on its claim.

We **REVERSE** and **REMAND** to the trial court for further consideration of prejudgment interest in light of the Court's opinion.

It is **ORDERED** that each party bear their own costs of this appeal.

Judgment entered this 14th day of February 2023.